## Case No. 52.

### ADAMS v. DOUGLAS COUNTY.

### ADAMS v. BEACH.

[McCahon, 235; 1 Kan. 627.]

Circuit Court, D. Kansas. May Term, 1868.

CIRCUIT COURTS — JURISDICTION — INJUNCTION — RAILWAY AID BONDS — CONSTITUTIONAL LAW— CORPORATIONS.

[1. A circuit court cannot take jurisdiction, on the ground of diverse citizenship, of suits by a nonresident taxpayer to enjoin county officers from issuing county bonds, and from levying a tax to pay the coupons thereof, unless the bill shows that the tax to be paid by complainant, or his liability, determined by the ratio of his taxable property to all the taxable property in the county, exceeds $500.]

[2. Allegations in such suit that complainant sues "on behalf of all others similarly situated and interested, to wit. all persons owning property subject to taxation in said county," do not show an amount in dispute sufficient to give the circuit court jurisdiction, as the amount of the interests of the parties so associated is not alleged; and, if the interests of such other persons be admissible on the question, residents, who could not be associated as complainants, must of necessity be included.]

[Cited in King v. Wilson, Case No. 7,810.]

[3. An issue of county bonds in aid of a railroad was authorized by a vote of the people, in the manner prescribed by law, with a condition that the railroad track should be completed and in full operation by a certain date, and that the road should run to Lawrence. The track was completed, but not equipped with turntables, water tanks, etc., by the date fixed, and came within only a quarter of a mile of Lawrence. Held, on application to enjoin the issue of the bonds and a tax levy to pay the first coupons, that there had been a substantial performance.]

[4. A nonresident taxpayer cannot maintain a suit to enjoin the issue of coupon bonds, and a tax levy to pay the coupons, unless he has some interest other than that common to the whole community.]

[5. A temporary injunction may be dissolved before the respondent answers when he is not charged with any particular knowledge of the facts alleged, and when the complainant's legal right is doubtful, and the continuance of the injunction unnecessary for his protection, and injurious to respondent.]

[6. Under the judiciary act of 1789, (1 Stat. 34,) as amended by 2 Stat. 418, authorizing district and circuit judges to grant injunctions in vacation, they have power to dissolve injunctions in vacation.]

[7. A temporary injunction granted in the unavoidable absence of the respondents, with the intention of hearing the whole case as if no injunction had been allowed, should be dissolved, even in vacation, as soon as lack of jurisdiction appears.]

[S. Const. Kan. art. 12, § 1, provides that corporations shall be created only by general laws. A company was incorporated prior to the adoption of the constitution by an act of the territorial legislature. which was continued in force by the constitution. Held, that the state legislature had power to amend the charter by special act. City of Atchison v. Bartholow, 4 Kan. 124; Smith v. Swormstedt, 21 Curt. Dec. 141; and Dodge v. Woolsey, 59 U. S. (18 How.) 331,—limited.]

[In equity. Bills by Phineas Adams to enjoin the county commissioners of Douglas county from issuing certain bonds, and Melancthon S. Beach, the county treasurer, and other county officers, from levying a tax to pay the coupons first due. On motions to dissolve temporary injunctions. Granted.]

DELAHAY, District Judge. These two suits concern, substantially, the same subject-matter. The first is instituted for the purpose of enjoining the county of Douglas, through its corporate authorities, from issuing certain bonds to the amount of three hundred thousand dollars, to the Leavenworth, Lawrence and Galveston Railroad; the second is to enjoin the treasurer, and other officers of the county, from the collection of a tax imposed by the commissioners, for the payment of the coupon due January 1, 1869, upon a bond for three hundred thousand dollars already issued, and from the application of the proceeds of such tax to the liquidation of the coupon. The facts in brief are, that the question of issuing bonds to the amount of three hundred thousand dollars to this company was submitted, by an order of the board of county commissioners, to the voters of the county, by virtue of an act of the legislature of the state as far back as the 8th day of February, 1867.

The terms and conditions upon which the issuance of the bonds was to be made are expressly stated in the submission, as follows: "Shall the county of Douglas subscribe three hundred thousand dollars, in full paid stock, to the capital stock of the Leavenworth, Lawrence and Galveston Railroad Company, and issue bonds of the county therefor, in bonds payable thirty years after date, bearing interest at the rate of seven per cent. per annum from the date of delivery, to be issued to said company when twenty-four miles of said railroad track shall be completed and in full operation from Lawrence, Douglas county, via Baldwin City: provided, that no greater amount of bonds shall be issued than the amount of stock issued by the railroad company to the county of Douglas.

"2. The conditions of the above is with the express understanding and agreement, that the said company shall relinquish all claim to the bonds for subscription of stock heretofore voted to said company, to wit, on the 12th day of September, 1865." The vote was taken with this result: Two thousand one hundred and seventy for the proposition, and four hundred and twenty-four against, a majority of little less than five-sixths of the entire vote.

The board of commissioners, by resolution, on the 15th day of April, 1868, reciting the above submission, the vote and the result, declared that, the company having complied with all the requirements, stock to the amount mentioned should be subscribed, and the bonds issued. Since this time, a series of suits in the state courts, some of which

(though by no means pertinently) were recited in the second bill, have been instituted for the purpose of restraining, by injunction, the said board from issuing these bonds and thus subscribing to the capital stock of the company. Now, for the first time, the same species of litigation is proposed in the federal courts. Phineas Adams, a non-resident of the state of Kansas, and a resident of the state of New Hampshire, as the complainant, has filed, on the equity side of the circuit court of the United States for the district of Kansas, the several bills mentioned, for the purpose of obtaining an injunction as already stated.

It will be seen, from this review of the facts, that the cases affect very large pecuniary interests, and the nature of the work, the early completion of which may much depend upon the aid contributed by the subscription for its stock, shows that the interests other than those merely pecuniary must be even greater. Not to introduce into this opinion the ordinary speculations as to the advantages to arise to the state, and especially to that region through which the proposed road will pass, it will suffice to call attention to the vote of the people of Douglas county, in illustration of their own estimate of these advantages. But in a country where railroad intercommunication commands so large a share of public interest, and elicits such immense outlays of capital, I might feel myself justified in enlarging upon this subject, were it not that, holding the scales of justice, and performing the duties of her minister. I am not allowed to be swayed from her dictates by any consideration of the character of one or the other of the litigants in her courts. The complainant is entitled, small though his interest may be in comparison to that appertaining to the other parties in this proceeding, to have that interest protected, provided he brings himself within the class of persons and exhibits an interest over which this court has jurisdiction. The respondents have moved for a dissolution of the injunctions which had been temporarily issued in the two cases, and insist, as grounds for their motion, from the showing of the bill and the papers filed in the cases: First. That this court has no jurisdiction. Second. That there are not such equities disclosed as entitle the complainants to a continuation of this relief. These propositions will be disposed of in their order.

The jurisdiction of the courts of the United States is prescribed by law, that of the circuit court included. Its jurisdiction is derived from the nature of the subject in controversy in some cases, and in others from the character of the parties, and in some from the union of those several elements. The latter is the case in the present instance. It must appear in the bill that the complainant is a non-resident of the state, to enable him to invoke the aid of this court,

otherwise he is remitted for redress to the courts of the state. In addition to this, it must appear in the bill that there is in controversy, or in jeopardy by the action of the respondents, whom he desires to restrain, an amount exceeding five hundred dollars. Judiciary Act 1789, c. 20, § 11, [1 Stat. 78.] The non-residence of the complainant sufficiently appears, and the respondents make no point to the contrary. Whether the bill shows more than the sum of five hundred dollars to be involved in the proceeding is another question. The respondents say, as one of their grounds of motion, that it does not. The complainant insists that it does. If, in any proper sense, the sum of three hundred thousand dollars, the amount of bonds the issue of which is asked to be enjoined, may be said to be in controversy, then of course, in the first case, no question can exist. There is a sense in which this amount may be said to be in controversy. But is it a sense which will determine the question in favor of the complainant? To be in controversy certainly can not, properly, be understood in any other sense than as being in an attitude to be decided in favor of, or against, the party who asks the interference of the court. While that amount is really the subject of which the court is asked to adjudicate, it is not the amount which the complainant claims that he is in jeopardy of losing by the respondents unless they are restrained.

We do not see how any other test of jurisdiction can be maintained, than that when more than five hundred dollars are required as the basis of jurisdiction, it must mean an amount exceeding five hundred dollars which the plaintiff is liable to lose or gain by the result of the suit. It could never have been intended by the act of congress, that because a subject matter may have been involved in the proceeding, worth more than five hundred dollars, therefore any non-resident may have brought his suit in the circuit court, even although his own interest may have been a very small amount of the item of property. The result of such a doctrine would be, or might be, to throng these courts with proceedings in which a mere trifle might be claimed by the complainant, simply because that trifle comprised a part—a small part—of some large interest. A single stockholder in a banking or any other corporation, to the amount of fifty dollars, might thus gain in the circuit court a foothold for litigation, merely because the capital stock of the company was a million. Thus all the safeguards, whether of protection of the courts against the annoyance of numerous petty litigations, or of parties against being burdened with the more inconvenient and expensive proceedings of courts of the United States, would be effectually destroyed. We understand the act of congress to mean, not that the party must litigate in reference to something worth

more than five hundred dollars, but that he must bring into court, to be adjudicated by it, an interest exceeding five hundred dollars in something, which interest he shall claim to have as against his adversary, or, in case of injunction, which interest his adversary is about to put in jeopardy by his action, against which he invokes the protection of the courts. This doctrine, besides being well established by the course of decisions in the supreme court, (see [Green v. Liter,] 8 Cranch. [12 U. S.] 229; [Gordon v. Longest,] 16 Pet. [41 U. S.] 97; [Childress v. Emory,] 8 Wheat. [21 U. S.] 642,) was recognized at a recent term of the circuit court for this district, Judge Miller presiding, when, in the case of Jewett v. Treasurer of Leavenworth County, [Case No. 7,312,] the suit was dismissed because it did not appear that, in a proceeding to enjoin the treasurer, the complainant's tax exceeded five hundred dollars. Now, by this test, we think it is clear that in neither of the cases does the complainant show himself to be entitled to a status here. In the first case, there is no allegation whatever as to any particular amount of interest he may have to be jeoparded by the issuing of the bonds; the allegation in this respect being simply that he is the owner of real estate liable to be taxed. In the second, he alleges that the amount in controversy exceeds five hundred dollars. This is not the phraseology of the statute; "matter in dispute," not amount in controversy, is the language. But while this language may mean something very different from that used in the statute, let us suppose it to be of synonymous import. Is the difficulty thereby avoided? Shall the question of jurisdiction be settled by the assertion of the complainant? We think not. Certainly it cannot be so settled when, as in this case, the showing of the bill is, that the bonds are proposed to be issued by a county to a corporation, and his interest can, upon the face of the bill, arise only from the fact of being as a taxable person subject to a liability, unless by further showing that he has an amount of property, of such a ratio to the whole property of the county as would raise his liability to more than five hundred dollars. But suppose that his right to sue were apparent from the bill, by the exhibition of an interest fully large enough to confer jurisdiction, or suppose the views hitherto expressed to be unsound, and that jurisdiction may arise simply upon the magnitude of the subject of litigation, without reference to that of his interest in the subject, still, upon authority, it is not only necessary that he should be competent to maintain this suit, but it is equally necessary that all other parties complainants should be so competent. "When the jurisdiction of the circuit court depends on the character of the parties, and such party consists of a number of individuals, every one must be competent to sue in the courts of the United States, or jurisdiction cannot be entertained." Wood v. Arredondo, [Case No. 17,148;] Mandeville v. Cookenderfer, [Id. 9,009.] Now the complainant sues as well for himself, he alleges, "as on behalf of all others similarly situated and interested," and claims that, if not himself sufficiently interested to make the amount exceeding five hundred dollars the basis of jurisdiction, he, along with the large number similarly situated, would certainly so be. This, however, he does not allege as a fact, and while we may admit the presumption to be a strong one, we cannot concede it, even if free from objection, to be sufficient to create the necessary "amount in dispute." But the attempt is open to several serious difficulties. The first is, whether a complainant may thus, without some special authority thereto, associate other parties with him; a second question is, whether, if allowed so to do, there is really any other party until he comes in, under the privilege accorded him, and is duly made a party. But a third, and yet more grave difficulty is, that this introduction of others, if admissible, is absolutely fatal to the status of the complainant. It would not be so, but might aid him, if he had stopped with the allegation as a moment ago herein incorporated, but this he does not do, but after claiming to sue, in the language quoted, for others as well as himself, he adds, "to wit, all persons owning property subject to taxation in said county," not all non-resident persons, but all persons. Of course, therefore, he sues alike for non-residents like himself and for residents. The authority a moment since alluded to requires all the complainants to be competent to sue, "or jurisdiction cannot be entertained." All persons liable to taxation must, of necessity, include residents who cannot be associated with him as complainants. Being so associated with him, all lose their right to the redress they ask. Thus, besides that there is not an affirmative showing of an amount in dispute sufficient to confer jurisdiction, there is no statement of facts from which this interest in him, making such amount in dispute, may be inferred. If this be true of the first case, how much more true is it of the other, when the object is to enjoin the collection of a tax of twenty-one thousand dollars, to pay the first coupon due upon a bond for three hundred thousand dollars heretofore issued. Evidence before me at the hearing tends to show that his interests, tested by his liability for taxes, does [do] not exceed five dollars. Not having in either case presented such an amount in dispute, this court has no jurisdiction to grant the relief prayed.

This view disposes of the case, and here this opinion might very well close, yet I do not think that I ought to leave the case without some review of the second proposition of the respondent, that the bill does not disclose such a case of merit as would

justify this court in granting the relief prayed. The legislature of the state of Kansas, in 1865, passed a law authorizing the counties, in the way therein pointed out, to subscribe stock for the purpose of advancing the public improvements of the class in question. Under that law, the board of commissioners of Douglas county submitted to the legal voters of that county the proposition, whether the sum of three hundred thousand dollars should be paid to the Leavenworth, Lawrence and Galveston Railroad, for which stock to this amount should be issued by the company to the county. A very large majority, as has already been said, was cast in favor of the proposition. Who are legal voters is defined by our constitution and laws. The complainant, by his showing in the bill as a groundwork of being admitted to prosecute the suit in this court, was not a legal voter. The constitution and laws of no state in this union confer the right of suffrage upon property, any more than do those of this state.

The law, therefore, and constitution of Kansas, have not given to the complainant in these suits any say whatever upon this question. In so far, this law may be unconstitutional. I do not propose to say that it is. I do not think that it is, but I have not reviewed, and do not propose to decide that question. I will remark only in passing that the law is certainly not so, as being against the constitution of the state. If there be any qualification of voters unconstitutional, it is that both the constitution and the law are so, as being in conflict with the constitution of the United States. The affirmative of this proposition would be so comprehensive as to affect the constitution and laws of every state in the union. These constitutional and legal questions may well suggest the inquiry, whether the complainant in this suit can have anything to do with the subject of these bills. He was not allowed, as a non-resident, to vote upon the question of authorizing the issuing of the bonds. Can he come into the courts of the United States, under any circumstances, claiming to exercise any control over this subject? With never so large an interest, the complainant might find himself embarrassed by this peculiar state of things. It is not made necessary by any presentation of the point to decide this question, and I shall, therefore, not do more than observe that, if to recognize such a barrier to his enforcement of a claim here should be said to present an exception to the rule that there is no wrong without a remedy, all that need be said in reply is, that the public policy of every state must, and does, sometimes give rise to similar anomalous conditions.

At all events, it may be safely said that, to lay a foundation of right in a case of this description, there should be distinct allegations, either of fraudulent collusion against complainant's interest or clear departure from the line of imposed duty. There are no such allegations in either of these bills.

Every one owning land in a state holds it subject to the constitution and laws of the state. Not willing so to hold it he may sell, or, preferring to hold it and not satisfied to be denied any privilege of citizenship in regard to it, he may relieve himself of the disability by becoming a citizen. But a few observations are due in reference to the allegations of the bill, relied upon particularly to show merits. They are, that, at a meeting alleged to be informal, certain values, consisting of other bonds and moneys, and stocks of other companies, were issued without sufficient consideration, and to give a controlling influence against the interests of Douglas county; that the road was not constructed and equipped, by reason of the want of turn tables, water tanks, etc., by the 1st of January, 1868, as by the terms of the submission of the question to the people it was provided it should be. It is supposed the court will take judicial notice of the necessity of these, as equipments of the road. It may be well questioned, on the contrary, whether a provision of water tanks, turn tables, etc., the want of which is alleged in proof of noncompliance by the company with the terms of the submission, was necessary to constitute a compliance. The language of the submission is, that the "railroad track shall be completed, and in full operation." While it is true that a railroad is, in one sense, incomplete without these appendages, in a more limited sense it is not so. Certainly a railroad track may be complete, literally, without any one of these, while it is not complete only when we make railroad track to mean something more than it literally does. But besides this, may not the requirement have been thus restricted, for the reason that it was not intended to exact more of the company than simply to construct the railroad track, literally, by that time, leaving those appendages necessary for its absolute completion, in a more extended sense, to follow, as of course they must to make it practically useful and valuable? Besides, time is not necessarily of the essence of an agreement, and particularly in proceedings in equity. The most that could be claimed is, that the board of commissioners might, or if it be preferred ought, to have forborne the issuing of the bonds, and submitted the question again to vote. But they are entrusted with the management of the interests of the county, and have a right to the exercise of a fair and honest discretion, and, if, in the exercise of this, they do what a fair man under the same circumstances might do, I can not see any just cause of complaint. The charge of an undue motive in issuing the values above mentioned is not sustained. Motive may be inferred and judged from circumstances, but is not very well capable of direct proof; a mere assertion, or even an assertion sustained

by affidavit amounts generally to no more than an opinion. But the same remarks may be made in reference to this as to the last matter, that the board of commissioners, being constituted by the law the guardians of the interests of the county, were the proper judges of the fairness of the transactions of the company, or they might, indeed, well think that, the county having voted in favor of the bonds and subscription, they had but the simple duty to perform to issue them. It is further alleged that, it being a part of the terms of the submission that the road should run to Lawrence, the company failed to comply, because the road only came within a quarter of a mile of that city. It is a very nice adherence to words to deny that this is a compliance with the requirement. "Qui haerit in litera, haerit in cortice." It would have been little, if any, more to exact that it should have come to the center of the city. A few hundred yards more or less, in a question of termination of a railroad, can not present, generally, a very grave doubt as to whether or not similar terms have been complied with. The intervention of a river, or other great natural impediment, between the terminus as made and such as a literal compliance with the language would have made, might present such a doubt. But nothing of that kind exists in this case. Whether the company owns the intervening space or proposes to acquire the title to it is not of importance.

There remain two other questions, to which some reference should be made before dismissing the second point of inquiry. First. May any and every individual nonresident tax payer institute such a proceeding against the corporate authorities of a county? While on the one hand, individual rights are entitled to protection, on the other, great public interests ought not lightly to be subjected to delay and annoyance. Whether any principle can be stated, that would be capable of application without possible hardship, may be doubted; to deny all redress to individuals in such cases would be apt, sometimes, to result in injustice. To recognize the right of every one to arraign public servants of the description under consideration is full of inconvenience and danger. High authorities have held that, unless the individual has some interest other than that which is common to the whole community, he can not maintain a proceeding in such cases. Doolittle v. Supervisors of Broome County, 18 N. Y. 155, and Roosevelt v. Draper, 23 N. Y. 318, are leading cases in a large class in support of this doctrine; and the following are a few, of many, by which they are sustained: [O'Brien v. Norwich & W. R. Co.,] 17 Conn. 372; [Smith v. City of Boston,] 7 Cush. 254; [Mayor, etc., of Georgetown v. Alexandria Canal Co.,] 12 Pet. [37 U. S.] 91; [Hale v. Cushman,] 6 Metc. [Mass.] 425; [Pratt v.

Bacon,] 10 Pick. 123; 3 Daniell, Ch. Pr. 1768–1770. With this doctrine I am much inclined to concur, as far more reasonable and just than that which would recognize every one, in a community of common interest, as entitled to arrest the onward progress of great public concerns. It may be that legislative wisdom might well direct itself to this subject, and, while amply protecting personal rights, provide more fully than now seems to be done the proper safeguards against ill advised invocations of judicial protection.

As a ground of equity interference, not only well established by authority but expressly provided by statute, for the government of the courts of the United States, redress rests upon the want of adequate remedy without it. "Suits in equity shall not be sustained in either of the courts of the United States, where plain, adequate and complete remedy may be had at law. Act Cong. 1789, ch. 20, § 16, [1 Stat. 82.]

While the equity jurisdiction of the courts of the United States is independent of the local law, and therefore no objection to their jurisdiction may arise from the fact of a remedy under the local law, as decided in Gordon v. Hobart, [Case No. 5,609;] 3 Cranch, C. C. 267, [Mandeville v. Cookenderfer,] Id. 9,-009;] yet, if such redress may be had at law in the courts of the United States, the equity jurisdiction now invoked plainly can not be entertained. Why may not such redress be had in these courts? There can be little doubt that, either in resistance of an unjust exaction or by proceedings to correct an evil suffered, redress at law might be successfully sought. This suggests another inquiry, which might well be somewhat elaborately considered, were the other propositions differently decided; that is, how far the equitable remedy by injunction is dependent upon the irreparability of the threatened wrong, and whether, judged by this standard, these suits are maintainable. But in the views I have taken this inquiry is rendered unnecessary. I will but ask, is there any evil, not to say irreparable, to be inflicted by the proceedings proposed to be enjoined, or on the contrary, are they not, however regarded by the complainant, of the highest advantage to him? If, indeed, some additional tax be the result, is it not likely to redound in a largely increased value of his property? Assuredly those to whom the proposition was submitted, and by whose votes it was determined, expect to reap large advantages from the outlay. It is inevitable that the complainant shall enjoy these as largely as others. In such a case he can not claim to be injured, had he a right to the position of complainant. The courtesy and ability with which the views of the learned counsel for the complainant have been presented will not permit me to close without noticing some of the leading authorities relied upon by him upon some other points. He objects to the dissolution in

these cases that no injunction can be dissolved until the coming in of the answers of the respondents, and in support refers to 3 Abb. Nat. Dig. p. 45, §§ 255, 256. [Read v. Consequa, Case No. 11,606; Robinson v. Cathcart, Id. 11,946.] That these authorities present this as the general rule is true, but the rule is not without exceptions. While it is recognized as the usual course, in injunction cases, that all parties shall answer, it is added, in a case of high authority, "But that rule may be dispensed with under peculiar circumstances, as when the party not answering is not charged in the bill with any particular knowledge of the facts alleged." Ashe v. Hale, 5 Ired. Eq. 55. There is no such allegation in the bills under consideration. Again, injunction was dissolved, the plaintiff's legal title being doubtful, and the continuance of the injunction being unnecessary for the protection of complainant and injurious to defendants. [Shrewsbury & B. Ry. Co. v. London & N. W. Ry. Co.,] 1 Eng. Law & Eq. 122. The doubtfulness of plaintiff's title in that case is fully met by the lack of complainant's legal status in this, while the want of necessity of protection to himself, and the injury to respondents, are quite as glaring here as they could have been there. Another qualification of the rule is, that "it is applicable only to an injunction properly issued." [Mallett v. Weybossett Bank,] 1 Barb. 217.

It is objected again, that dissolution can not be made in vacation. Brightly, Dig. p. 256, § 5. The power in injunctions, as conferred upon the judges of the district courts, is peculiar and ample. It is as follows: "The judges of the district courts of the United States shall have as full power to grant writs of injunction, to operate within their respective districts, in all cases which may come before the circuit courts within their respective districts, as is now exercised by any of the judges of the supreme court of the United States, under the same rules, regulations and restrictions as are provided by the several acts of congress establishing the judiciary of the United States, any law to the contrary notwithstanding: provided, that the same shall not, unless so ordered by the circuit court, continue longer than to the circuit court next ensuing; nor shall an injunction be issued by a district judge in any case where a party has had a reasonable time to apply to the circuit court for the writ." 2 Stat. 418.

This, it will be seen, confers upon the judges of the district courts, not the courts themselves, the same power as have the judges of the supreme court. The power of these latter is derived from the judiciary act, (1 Stat. 34.) "Writs of ne exeat and of injunction may be granted by any judge of the supreme court, in cases where they might be granted by the supreme, or a circuit court." Whence it follows, that the judges of the district courts, to the extent

of their territorial jurisdiction, have in these matters the full power of the supreme and circuit courts. This carries as well, in vacation, the power to dissolve as to grant, the former being incident to the latter. The act of the 23d August, 1842, (5 Brightly, Dig. p. 257, § 6, [5 Stat. 517, § 5,] is amply confirmatory: "And it shall be competent for any judge of the court, upon reasonable notice to the parties, in the clerk's office or at chambers, and in vacation as well as in term, to make, direct, and award all such process, commissions, and interlocutory orders, rules and other proceedings, whenever the same are not grantable of course, according to the rules and practice of the court." But besides this view of the law of the question, the attitude of these cases is such as, itself, to make an exception to the rules ordinarily governing the dissolutions of injunctions, whether it respect the doing so without answer or the exercise of the power in the vacation. When applied for, a time was fixed for a hearing. The respondents were hindered by circumstances not under their control from attending, and the hearing was adjourned to Thursday, December 17, 1868. In the meantime the injunction was granted, temporarily, but it was not intended that the respondents should thereby be placed in any worse, or the complainants in any better situation, but, on the contrary, it was understood that the whole cases were to be heard as if no injunctions had been allowed. Under such circumstances, I cannot hesitate to treat them as of themselves exceptional, and not properly to be circumscribed by what, under other circumstances, might be not a too rigid rule, but, in addition to all this, is it not abundantly clear that, if the views expressed as to the question of jurisdiction are sound, a dissolution ought to be allowed? I understand the doctrine to not need to be sustained by accumulating authorities, that so soon, at whatever stage of a cause, as a want of jurisdiction shall be disclosed, the further entertainment thereof shall cease.

The complainant's counsel insists further that the Leavenworth, Lawrence and Galveston Railroad Company has no corporate existence, and relies upon article 12, § 1, Const. Kan.: "The legislature shall pass no special act conferring corporate powers; corporations may be created under general laws, but all such general laws may be amended or repealed." This company was incorporated under a territorial law of 1858, before the adoption of the constitution. Under the fourth section of the schedule that law was undoubtedly continued in force. It was amended by act of 1864, and it is claimed that, under the decision of the supreme court of the state of Kansas, in the case of the City of Atchison v. Bartholow, 4 Kan. 124, the last named act is unconstitutional. That the provision first cited is to be construed as denying to the legislature the

power to regulate and control franchises theretofore granted, is a doctrine to which I cannot assent. To regulate and control are essentially different from creating. The direct consequence of such a construction would be that, however pernicious privileges before granted might be found in their exercise, no remedy in legislative control would exist. I may safely, therefore, assume, without presenting the differences of the two cases and particularly analyzing the opinion of the supreme court, that they did not intend their decision to reach to the extent claimed, but based it upon the fact that, in that case, the law reviewed by them created corporate power. Nor, for the same reason, do I deem it necessary to indicate some very material differences between an incorporate company and a municipal organization known as a city.

Complainant's counsel refers to several authorities to sustain the right of the complainant to seek redress as he here does, the most prominent of which are Smith v. Swormstedt, 21 Curt. Dec. 141, and Dodge v. Woolsey, 18 How. [59 U. S.] 331. The first was an application for a division of a common property of the Methodist Episcopal Church, the complainants averring that the bill was brought by authority and under the direction of the general and annexed conferences of the church south, which had been erected into a separate ecclesiastical organization under an ordinance of a general conference and the subsequent action of certain annual conferences. That the supreme court recognized the complainants as competent parties in such a proceeding does not furnish support to the complainant in this suit. The case in 18 How. [59 U. S.] does not seem to me to be any more influential in this direction.

This opinion has already grown too long to permit me to feel at liberty to more particularly review the last mentioned or other authorities cited in opposition to the conclusions I have reached. The injunctions heretofore issued in these causes are dissolved, with costs.

NOTE, [from original report.] An injunction may be granted to enjoin the illegal levy of any tax charge or assessment, or the collection of any illegal tax charge or assessment, or any proceeding to enforce the same; and any number of persons whose property is affected by a tax or assessment so levied, may unite in the petition filed to obtain such injunction. Dass. Comp. Laws, § 3781. Mere irregularities cannot be inquired into. Parker v. Challiss, 9 Kan. 155; Smith v. Leavenworth Co., Id. 296; Kansas Pac. Ry. Co. v. Russell, 8 Kan. 558; Lawrence v. Killam, 11 Kan. 499; Challiss v. Atchison Co., 15 Kan. 49; Stebbins v. Challiss, Id. 55; Hagaman v. Cloud, 19 Kan. 394. Who may join in the action. See Gilmore v. Norton, 10 Kan. 491; Gilmore v. Fox, Id. 509; Wyandotte & K. C. Bridge Co. v. Wyandotte, Id. 326; Hudson v. Atchison, 12 Kan. 140. Who cannot maintain the action. Missouri R., Ft. S. & G. R. Co. v. Wheaton, 7 Kan. 232; Wyandotte & K. C. Bridge Co. v. Wyandotte, 10 Kan. 326; State v. McLaughlin, 15 Kan. 228.

He who seeks equity must do equity, applies to actions under this section. Missouri R., Ft. S. & G. R. Co. v. Morris. 7 Kan. 210; Lawrence v. Killam, 11 Kan. 499.

